# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

ERIN J. PAXSON,

     Plaintiff

v.

LIVE NATION ENTERTAINMENT, INC., et al.,

     Defendants

Case No.: 2:24-cv-00907-APG-EJY

**Order Granting Live Nation Entertainment Defendants' Amended Motion to Compel Arbitration, Denying Plaintiff Erin Paxson's Motion for Class Certification, and Denying Plaintiff's Motion for Leave to File a Sur-reply**

[ECF Nos. 11, 30, 38]

Erin J. Paxson brings a class action suit against Live Nation Entertainment, Inc.; Live Nation Worldwide, Inc.; Live Nation Worldwide, LLC[1]; C3 Presents, LLC; and Front Gate Ticketing Solutions, LLC (jointly, Live Nation) for claims arising from the 2022 Lovers and Friends music festival. She alleges claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) unjust enrichment, and (4) violations of the Ohio Consumer Sales Practices Act. Paxson alleges that these violations occurred when Live Nation employees allegedly caused a stampede at the festival and organizers subsequently failed to issue refunds to her and other attendees.

Live Nation moves to compel individual arbitration, arguing that Paxson agreed to arbitrate her claims when she bought tickets to Lovers and Friends on Front Gate's website. They assert that as part of her purchase process, she assented to its terms of use and purchase, including a binding arbitration clause. It requests that I dismiss the case and delegate any arbitrability questions to the arbitrator, or otherwise enforce the arbitration agreement. In the

---

[1] Live Nation Entertainment, Inc.'s Senior Vice President of Litigation states in a declaration that "'Live Nation Worldwide, LLC' is not a known or existing entity." ECF No. 2 at 2.

alternative, it argues that I must transfer the case to the Central District of California per the terms' forum selection clause.

Paxson responds that choice of law rules say I should apply Ohio law, under which she argues the arbitration agreement fails for two reasons. First, Paxson asserts she did not assent to Front Gate's terms because the hyperlinks were not displayed prominently enough to provide sufficient notice. Second, she argues there was no consideration for the arbitration agreement because the terms of use (including the arbitration clause) allow Front Gate to unilaterally change the terms at any time and without notice, thus defeating a mutuality of obligation. She also argues that I should deny Live Nation's motion for lack of evidentiary support because Front Gate's declarant, Brandon Little, did not have personal knowledge to testify to Paxson's assent to the terms, and the records he used to attest to her assent are based on inadmissible hearsay.

In reply, Live Nation argues that California or Nevada law, not Ohio law, should apply. It asserts that under Nevada law, the arbitration agreement is valid because Paxson had notice of the terms of use and assented to them, including the arbitration clause, and there was consideration or at least an implied duty of good faith and fair dealing that would preserve the agreement as valid. It also asserts that under Ninth Circuit law, Little's personal knowledge may be inferred from his position as Vice President of Operational Services at Front Gate, and that he permissibly reviewed business records excepted from hearsay in making his declaration.

I previously granted Paxson's request for limited discovery to obtain the historical records of Paxson's checkout process on the Front Gate website as it existed in August 2021. Paxson now moves for leave to file a sur-reply, arguing that Live Nation submitted new evidence

1 in its reply to the supplement that raises new issues. Live Nation counters that it only presented

2 permissible rebuttable points.

3       I deny Paxson's motion for leave to file a sur-reply because Live Nation did not raise new

4 issues or present materially new evidence that require further argument. I also grant Live

5 Nation's motion to compel arbitration. Applying Nevada's conflict-of-laws rules, Nevada has

6 the most significant relationship with the parties and the issues because it is the location of the

7 contract's main subject matter: the Lovers and Friends festival. Under Nevada law, Front Gate

8 provided reasonably conspicuous notice of its terms and Paxson assented to them at the time she

9 purchased the tickets to the festival. There was consideration for the arbitration agreement

10 because Live Nation was equally bound to arbitration, and it could not retroactively change its

11 terms once Paxson brought her claims. In addition, because Nevada recognizes the implied

12 covenant of good faith and fair dealing, the unilateral modification clause does not render the

13 agreement illusory. Thus, Paxson assented to Front Gate's terms when she purchased tickets to

14 Lovers and Friends and the arbitration agreement is valid. Because neither party has requested a

15 stay, I dismiss Paxson's claims without prejudice because she must arbitrate them.

16   **I.      BACKGROUND**

17       In 2021, Live Nation sold tickets on Front Gate's website for the 2022 Lovers and

18 Friends music festival taking place in Las Vegas, Nevada. ECF No. 30-2 at 3-4. Before a user of

19 Front Gate's website could purchase a ticket, they were required to affirmatively check a box

20 with language next to the checkbox stating, "[b]y checking this box I am providing an electronic

21 signature acknowledging and agreeing to the Terms of Sale." *Id.* at 4. Language directly below

22 the checkbox stated: "[b]y continuing past this page, you agree to the Terms of Use and Terms of

23 Sale and understand that your information will be used as described in our Privacy Policy." *Id.*

The "Purchase Tickets" button was located immediately below this statement. *Id.* The terms of use and terms of sale were underlined and hyperlinked in a blue/purple color on a white background. *Id.* at 4-5. The surrounding, non-hyperlinked text of the notice was black/gray and not underlined. *Id.* The terms of use hyperlink led to Front Gate's terms of use on its website. *Id.* at 5.

As relevant here, Front Gate's terms of use included an arbitration agreement, including a delegation clause, which read:

> Any dispute or claim relating in any way to your use of the Site, or to products or services sold or distributed by us or through us, will be resolved by binding arbitration rather than in court . . . .

> The arbitration agreement in these Terms is governed by the Federal Arbitration Act (FAA), including its procedural provisions, in all respects. This means that the FAA governs, among other things, the interpretation and enforcement of this arbitration agreement and all of its provisions, including, without limitation, the class action waiver discussed below. State arbitration laws do not govern in any respect.

> This arbitration agreement is intended to be broadly interpreted, and will survive termination of these Terms. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement, including, but not limited to any claim that all or any part of this Agreement is void or voidable . . . .

> We each agree that the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. You agree to waive any right to a jury trial or to participate in a class action.

ECF No. 30-3 at 20-22.  In addition, the terms of use stated that Front Gate could unilaterally change the terms at any time, with the user agreeing to the changes if they continued to use the website after Front Gate made the changes.[2] *Id.* at 2-3.

In August 2021, Paxson bought tickets to the festival on Front Gate's website. ECF Nos. 30-2 at 4; 32-2 at 2.  Paxson alleges that at the event, Live Nation employees erroneously disseminated later-debunked information about a shooter on the festival grounds, causing a stampede and significant interruption of the live performances. ECF No. 25 at 4-5.  Paxson argues that this, along with other alleged failures by Live Nation to deliver on what it advertised as being part of the festival (including free water stations), entitled her and other attendees to a refund or a credit. *Id.* at 5-6.  Live Nation did not offer refunds or credits to Paxson or other attendees. *Id.* at 6.

## II.    ANALYSIS

### A. Choice of Law

The Federal Arbitration Act (FAA) states that arbitration agreements arising from interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Because Paxson bought the tickets online, and "the Internet is an instrumentality and channel of interstate commerce," the FAA governs. *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) (quotation omitted).  The FAA limits the district court's role to determine (1) whether a valid arbitration agreement exists, and (2) whether the dispute at issue is covered by the agreement.

---

[2] The terms state: "We may make changes to these Terms at any time.  Any changes we make will be effective immediately when we post a revised version of these Terms on the Site.  The 'Last Updated' date above will tell you when these Terms were last revised.  By continuing to use this Site after that date, you agree to the changes." ECF No. 30-3 at 2-3.

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).  I do not consider the merits of the underlying dispute. *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991).  And "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 71 (2019).  However, I "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 72 (quotation omitted).

Here, the parties do not agree that there is a valid arbitration agreement.  Live Nation argues that there is, while Paxson argues that she did not assent to the terms of use, which includes the arbitration clause.  But Paxson does not dispute that Front Gate's arbitration agreement encompasses her claims if I find it to be valid, so the only issue is whether there is a valid arbitration agreement.

The parties also dispute whether they chose a governing law to decide the question of whether there is a valid arbitration agreement.  Live Nation argues that the parties chose California law under the terms of use, while Paxson insists that she did not choose California law because she did not assent to the terms.  Front Gate's terms feature a forum selection clause. ECF No. 30-3 at 21.  It does not include a choice of law clause beyond noting that the terms "will be governed by and construed in accordance with federal law to the fullest extent possible." *Id.* at 21-22.  "[A] general choice-of-law clause within an arbitration provision does not trump the presumption that the FAA supplies the rules for arbitration." *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002), *opinion amended on denial of reh'g*, 289 F.3d 615 (9th Cir. 2002).  And under the FAA, I determine if an arbitration agreement is valid under the FAA by applying "ordinary state law principles that govern the formation of contracts." *Heckman v. Live*

*Nation Ent., Inc.*, 120 F.4th 670, 680 (9th Cir. 2024) (quotation omitted). Federal courts sitting in diversity apply the law of the forum state, in this case Nevada, for choice of law questions. *Nguyen*, 763 F.3d at 1175. Nevada generally follows the Restatement (Second) of Conflict of Laws, including commentary, for choice of law questions involving contracts. *Progressive Gulf Ins. Co. v Faehnrich*, 327 P.3d 1061, 1063-64 (Nev. 2014) (en banc).

Per Section 187 of the Restatement, Nevada generally applies the law of the state that the parties have chosen. *Id.* at 1064; Restatement (Second) of Conflict of Laws § 187(a) (1971). However, in the absence of a choice-of-law provision, Nevada enlists the substantial relationship test to determine the governing law, using factors identical to Section 188 of the Restatement. *Williams v. United Servs. Auto. Ass'n*, 849 P.2d 265, 266 (Nev. 1993); Restatement (Second) of Conflict of Laws § 188. "Under this test, the state whose law is applied must have a substantial relationship with the transaction; and the transaction must not violate a strong public policy of Nevada." *Williams*, 849 P.2d at 266. I determine which state has the most substantial relationship to the contract by examining(a) "the place of contracting," (b) the place of the contract's negotiation, (c) "the place of performance," (d) "the location of the subject matter of the contract," and (e) the parties' domicile, residence, nationality, place of incorporation, and place of business. *Id.* (quotation omitted). I evaluate these contacts "according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 188(2) (1971).

Under this test, Nevada has the most significant relationship to the transaction. First, the place of contracting is Ohio because there Paxson performed the last act necessary to create a binding contract by paying for the tickets and allegedly agreeing to Front Gate's terms. Restatement (Second) of Conflict of Laws § 188, cmt. e (1971). While the Restatement notes

that this factor is "relatively insignificant" when standing alone and "bear[ing] no relation to the parties and the contract," the factor has some weight here because Paxson is an Ohio resident. *Id.* Second, the place of negotiation is a neutral contact because no negotiation took place. This was an adhesion contract where Paxson could purchase the tickets and agree to Front Gate's terms of use or forgo the opportunity to attend Lovers and Friends. *Burch v. Second Jud. Dist. Ct. of State ex rel. Cnty. of Washoe*, 49 P.3d 647, 649 (Nev. 2002) ("This court has defined an adhesion contract as a standardized contract form offered to consumers on a take it or leave it basis, without affording the consumer a realistic opportunity to bargain. The distinctive feature of an adhesion contract is that the weaker party has no choice as to its terms." *Id.* (simplified)).

Third, the place of performance is also an insignificant factor because performance was "divided more or less equally" among jurisdictions with different laws on particular, relevant issues. Restatement (Second) of Conflict of Laws § 188, cmt. e (1971). Paxson paid for the tickets and allegedly agreed to the terms of use in Ohio. ECF No. 32-2 at 3. Live Nation hosted the festival in Nevada, and Front Gate received complaints regarding its terms in California. ECF Nos. 30-2 at 3; 30-3 at 23. The states also may have different laws on at least one key issue: whether unilateral modification clauses are invalid or render a contract invalid. California recognizes unilateral modification clauses as valid so long as the power to unilaterally modify is "subject to limitations, such as fairness and reasonable notice." *Asmus v. Pac. Bell*, 999 P.2d 71, 79 (Cal. 2000). In contrast, neither the Supreme Court of Nevada nor the Supreme Court of Ohio has addressed this issue. I and other judges in this district have previously ruled that under Nevada law, the implied covenant of good faith and fair dealing constrains the unilateral exercise of the right to modify or terminate, thus preserving the validity of an arbitration agreement with a unilateral modification clause. *See Reno v. W. Cab Co.*, No. 2:18cv-00840-APG-NJK, 2020 WL

8

5606897, at *2 (D. Nev. Sept. 18, 2020); *see also Cohn v. Ritz Transp., Inc.*, No. 2:11-cv-01832-JCM-NJK, 2014 WL 1577295, at *2 (D. Nev. Apr. 17, 2014) (concluding that due to the implied good faith covenant, a "provision that allows employers to unilaterally modify contractual terms, without an actual demonstration of bad faith, does not render a contract illusory").  Cases from Ohio have had more mixed results.  There, several lower courts have stated that a contract cannot be unilaterally modified.[3]  But at least one Ohio lower court has ruled a unilateral modification clause as valid.  There, the court declared that the party reserving the right to unilaterally modify did not have to do so in good faith so long as the contract's terms were unambiguous, and the other party had notice and accepted the risk of modifications. *Englert v. Nutritional Scis., L.L.C.*, No. 07AP989, 2008 WL 4416597, at *6-7 (Ohio Ct. App. 2008).  Another has stated that "[a] party with a unilateral right to modify a contract does not have the right to make any kind of change whatsoever," suggesting that unilateral modifications must be made in good faith. *Gibbs v. Firefighters Cmty. Credit Union*, 177 N.E.3d 294, 299 (Ohio Ct. App. 2021).  This apparent lack of clear unity on this issue among the states where the parties performed leads me to conclude the place of performance is a relatively insignificant factor.

Fourth, the location of the contract's subject matter, the Lovers and Friends festival, was Nevada.  Paxson narrowly frames the subject matter of the arbitration clause as her usage of the Front Gate website, but the arbitration clause went beyond this to encompass any kind of dispute between Paxson and Live Nation, including issues arising from the event.  It states, "[a]ny dispute or claim relating in any way to [Paxson's] use of the Site, or to products or services sold

---

[3] *See e.g.*, *Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*, 102 N.E.3d 579, 583 (Ohio Ct. App. 2017); *First Nat'l Bank of Penn. v. Nader*, 89 N.E.3d 274, 283 (Ohio Ct. App. 2017); *Wehr v. Petraglia*, 65 N.E.3d 242, 253 (Ohio Ct. App. 2016); *Cuspide Props., Ltd. v. Earl Mech. Servs.*, 53 N.E.3d 818, 829 (Ohio Ct. App. 2015).

or distributed by [Front Gate] or through [Front Gate], will be resolved by binding arbitration rather than in court." ECF No. 30-3 at 20-21. The events at the festival are the core of this dispute. The arbitration clause existed as part of the terms of use, and the terms are part of the contract for tickets to the festival. The only reason Paxson used the website was to purchase tickets to the festival. Likewise, Front Gate's purpose for hosting its website and requiring Paxson to agree to the terms of use was to facilitate the purchase of tickets to the festival. Paxson's access of Front Gate's site is inextricably intertwined with buying tickets to the festival, and her claims center on what she believes she was promised as part of the festival. Thus, the Lovers and Friends festival is the subject matter of the contract and Nevada is the situs.

Finally, the parties' domicile, residence, nationality, place of incorporation, and place of business take on greater importance when combined with another contact with the state, such as when the state is also the place of contracting and performance. Restatement (Second) of Conflict of Laws § 188, cmt. e (1971). Here, the fifth factor weighs in favor of Ohio because Paxson resides in Ohio, in addition to her place of contracting and place of performance also being there. The Live Nation defendants are incorporated or have their principal place of business in Delaware, California, Texas, and Virginia. ECF Nos. 1 at 45; 2 at 2. Front Gate, whose parent company (Live Nation Worldwide, Inc.) is headquartered in California and partially performs in California by receiving complaints and other correspondence regarding its products and terms of service. ECF Nos. 2 at 2; 30-3 at 10, 22. But none of the defendants shares more points of contact with their place of business or incorporation than Paxson does with Ohio.

Although two factors weigh in favor of Ohio (place of contracting and place of domicile), Nevada, as the location of the Lovers and Friends festival, has the most substantial relationship

to the parties and the issues.  The subject matter situs is an especially important contact where, like here, the contract and the parties' performances and expectations center on a "specific, physical thing, such as land or chattel, or affords protection against a localized risk." Restatement (Second) of Conflict of Laws § 188, cmt. e (1971).  The Restatement comment notes that "[t]he state where the thing or the risk is located [has] a natural interest in transactions affecting it" and "the parties will regard the location of the thing or of the risk as important." *Id.*; *see also Williams*, 849 P.2d at 266.  And to the extent the parties "thought about the matter at all, [they] would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract." Restatement (Second) of Conflict of Laws § 188, cmt. e (1971).

Paxson's suit arises from events that occurred at the festival.  While the festival itself is not a "physical thing," there are specific, physical things that Paxson argues she was promised as part of the festival, including live music, certain food choices, and free water stations. ECF No. 25 at 4, 6.  Paxson also alleges that she had a "reasonable expectation that [Live Nation] would provide a reasonably-run concert," which was thwarted by the alleged actions of festival employees who acted or failed to act in Nevada. ECF No. 25 at 4.

Moreover, Nevada as the situs state has a natural interest in having its laws applied to claims arising from a festival and alleged stampede that took place within the state. *Id.*  The parties' justified expectations also align better with Nevada than Ohio or other states.  Although Live Nation argues that the fact that Paxson brought suit in Nevada and hired a Nevada law firm should play a role in this analysis, these are not relevant factors in the substantial relationship test. *See Vignola v. Gilman*, 854 F. Supp. 2d 883, 889 (D. Nev. 2012) (rejecting the argument that the court should apply Nevada law under the substantial relationship test because the

plaintiff brought suit in Nevada and hired a Nevada lawyer).  Nevertheless, Paxson's suit centers

on events that took place at Lovers and Friends and what she alleges Live Nation failed to

deliver at the event.  Thus, it is reasonable that she could "expect that the local law of the state

where [Lovers and Friends] was located would be applied." Restatement (Second) of Conflict of

Laws § 188, cmt. e (1971).  And though Live Nation's first preference is for California law, it

concedes that its expectations align better with the application of Nevada law than Ohio law.

ECF No. 33 at 12-14.

Compared to Nevada, Ohio's contacts and interest in having its law applied are less

significant.  Ohio's only link to this dispute is that Paxson resides there and she bought tickets

over the Internet while physically present in Ohio.  She does not argue that she bought the tickets

in Ohio with the intention of seeking Ohio's protection. *See* ECF No. 32 at 13.  Ohio's interest in

a festival and alleged stampede that happened in another state are limited.  While it may have an

interest in protecting its residents who were attendees, Nevada, in contrast, hosted all the

attendees.  Therefore, Nevada has the most substantial relationship to the issues and parties.  And

because using Nevada law here would not violate a fundamental public policy of Nevada, I apply

it to determine the validity of the arbitration agreement.

**B.  Validity of Arbitration Agreement**

    **i.  Reasonable Notice and Assent**

Paxson argues that she did not assent to the arbitration agreement because the hyperlink

to the terms of use on Front Gate's checkout page was "not highlighted by a contrasting color

and was intentionally de-emphasized." ECF No. 32 at 14.  She also states that the limited time to

complete the purchase, along with the arbitration agreement being on page 20 of the terms,

further "minimize[d] the user's attention to the specific agreement containing the arbitration

clause." *Id.* at 16 (quotation omitted).  Live Nation counters that Front Gate provided Paxson

with sufficiently conspicuous notice of the terms of use because the blue/purple hyperlinks to the

terms contrasted with the white background of the webpage.  Moreover, it notes that to buy the

tickets, Paxson had to have checked a box acknowledging her assent to the terms of sale, along

with language immediately above the "purchase tickets" button warning her that clicking the

button meant that she agreed to the terms of use and terms of sale.  It argues that whether Paxson

actually clicked on the hyperlinks or read the terms does not matter because she was on notice of

the terms and assented to them by purchasing the tickets.

An agreement requires an offer, acceptance, a meeting of the minds, and consideration.

*Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 255 (Nev. 2012).  Nevada has a

"fundamental policy favoring the enforceability of arbitration agreements," and it "liberally

construe[s] arbitration clauses in favor of granting arbitration." *Uber Techs., Inc. v. Royz*, 517

P.3d 905, 908 (Nev. 2022) (en banc) (quotation omitted).  The Supreme Court of Nevada has

stated that online users of a website accept a company's terms and conditions when they

"indisputably" perform an action, such as creating an account, that requires the user to agree to

the terms. *Royz*, 517 P.3d at 911 n.3.  This inference applies regardless of whether the user

actually clicked on the hyperlink or reviewed the terms. *Id.*

As support, the *Royz* court cited *Meyer v. Uber Technologies, Inc.*, a Second Circuit case

that addressed the issue of when an online notice provides the user with reasonably conspicuous

notice. *Id.*; 868 F.3d 66, 77-80 (2d Cir. 2017).  The *Meyer* court held that a company provided

reasonable notice of its online terms and conditions when it (1) displayed a notice that by

creating an account, the user agreed to the company's terms of service; (2) this notice text, which

included the underlined hyperlinks to the terms, appeared directly below the registration button;

(3) the dark font color of the notice "contrast[ed] with the bright white background, and the hyperlinks [were] in blue and underlined;" and (4) the hyperlinked text was immediately visible to the user without scrolling down. *Meyer*, 868 F.3d at 78.  The *Meyer* court also noted elements of an insufficiently conspicuous notice on a webpage, including distracting variations of font sizes and colors, elements cluttering the user's screen, and the notice of the terms not being "directly adjacent to the button intended to manifest assent to the terms." *Id.* (quotation omitted). The opinion specified that the insufficiently conspicuous notice lacked spatial and temporal proximity to the "create account" button, whereas notices that properly coupled the notice to the mechanism for manifesting assent would provide "notice of the Terms of Service [] simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply." *Id.*  The court reasoned that a "reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account" and so long as the hyperlinked text was reasonably conspicuous, such users were given constructive notice of the terms. *Id.* at 78-79.

The *Royz* court also cited to *Cordas v. Uber Technologies Inc.*, 228 F. Supp. 3d 985 (N.D. Cal. 2017).  The *Cordas* court ruled that the user of an app assented to the company's terms and conditions by affirmatively clicking a "DONE" button to complete the sign-up process on a page that displayed a notice saying "[b]y creating an [] account, you agree to the Terms & Conditions and Privacy Policy." *Id.* at 990.

Under Nevada law, Live Nation provided reasonably conspicuous notice of its terms and Paxson, who was on constructive notice, assented to those terms when she bought tickets to Lovers and Friends.  Paxson indisputably purchased tickets to the festival and by clicking the "Purchase Tickets" button. ECF Nos. 30-2 at 4; 32-2 at 2; 37-2 at 4.  In doing so, she was

1  required to check the box acknowledging her assent to Front Gate's terms. ECF Nos. 30-2 at 4;

2  37-2 at 4.  Right below this box was the warning that moving onto the next page by clicking the

3  "Purchase Tickets" button meant that she agreed to Front Gate's terms of use and sale. ECF Nos.

4  30-2 at 4; 37-2 at 4.

5        While Paxson argues that the font color of the hyperlinks to the terms did not sufficiently

6  contrast with the surrounding notice text for reasonably conspicuous notice, Front Gate's notice

7  is similar in several ways to the notices that the *Meyer* court deemed to be reasonably

8  conspicuous.  Front Gate's website provided Paxson with two types of warnings declaring that

9  purchasing tickets meant agreeing to Front Gate's terms: (1) the box she was required to check

10  acknowledging her assent to Front Gate's terms of sale, and (2) the text below the box warning

11  her that clicking the "Purchase Tickets" button meant that she agreed to Front Gate's terms of

12  use and sale. ECF Nos. 30-2 at 4; 37-2 at 4.  The text with hyperlinks to the terms of use and sale

13  were directly above, rather than below, the "Purchase Tickets" button, arguably offering greater

14  conspicuousness and attracting more attention than the notice analyzed in *Meyer*. ECF Nos. 30-2

15  at 4; 37-2 at 4.  This order effectively forced Paxson to confront the text of the notice before

16  seeing the purchase button below.  In contrast, the text of the notice in *Meyer* was located below

17  the "Create Account" button, which the user could avoid if they chose to click the button and

18  proceed to the next page without looking any further below. *Meyer*, 868 F.3d at 78.

19        Additionally, the text of the notice was black/gray, the hyperlinks to the terms were a

20  noticeably lighter blue/purple color and underlined, and both were set off on a white background.

21  ECF Nos. 30-2 at 4; 37-2 at 4.  Although Paxson argues that the alleged lack of significant color

22  contrast between the purple/blue hyperlinks and the surrounding black/gray text of the notice

23  made the notice inconspicuous, Front Gate's color scheme parallels the "dark print" and blue

1  hyperlink the *Meyer* court deemed acceptable. *Meyer*, 868 F.3d at 78.  As the *Meyer* court noted,

2  "a reasonably prudent smartphone user knows that text that is highlighted in blue and underlined

3  is hyperlinked to another webpage where additional information will be found." *Id.* at 77-78.

4          Finally, both the checkbox and the notice of the terms were contained within a single

5  webpage and would have been visible to Paxson without her having to scroll down. ECF Nos.

6  30-2 at 4; 37-2 at 4.  Front Gate also gave notice of its terms simultaneously to purchase,

7  "connecting the contractual terms to the services to which they apply" and allowing Paxson, as a

8  "reasonably prudent smartphone user . . . [to] understand that the terms were connected" to the

9  ticket purchase before she proceeded with the transaction. *Meyer*, 868 F.3d at 78.  Front Gate's

10  checkout page meets all four of the *Meyer* factors for reasonable conspicuousness and therefore

11  provided Paxson with reasonable notice.

12          Paxson's other arguments that she did not assent because the countdown timer on the

13  checkout page gave her limited time to review the terms, as well as the fact that the arbitration

14  clause was on page 20 of the terms, are unavailing.  Based on Front Gate's current checkout

15  process, which Paxson states would approximate her own experience, she had about ten minutes

16  or less to purchase her tickets. ECF No. 32-1 at 3, 5.  While not unlimited time, this still gave her

17  the opportunity to access the terms of use and read through them, or to otherwise stop the

18  transaction.  She had the choice to read through the terms and chose not to.  The *Royz* court

19  noted that it does not matter whether the user actually clicked the hyperlink to the terms or

20  viewed them, so long as they had reasonably conspicuous notice and proceeded to manifest their

21  assent to the terms by completing the online process, which Paxson did here. *Royz*, 517 P.3d at

22  911 n.3.  Front Gate provided reasonably conspicuous notice of its terms, Paxson was on

23  constructive notice, and she had the choice to not click "purchase tickets" and reject them.  By

1   purchasing the tickets, she indisputably manifested her assent to Front Gate's terms of use and

2   sale.

3       **ii.    Consideration**

4       Alternatively, Paxson argues that the arbitration agreement fails for lack of consideration

5   because Front Gate reserved the right to unilaterally change its terms of use without notice.  Live

6   Nation counters that the terms "are not illusory because they are not wholly under [Front Gate's]

7   control." ECF No. 33 at 11.  It argues that the any changes would apply prospectively, which

8   would "not impact the terms for [Paxson's] ticket purchase." *Id.* at 10.  Live Nation also argues

9   that under California and Nevada law, its ability to change the terms is limited by the implied

10  covenant of good faith and fair dealing, so the agreement is not illusory.

11      Under Nevada law, a contract "must be supported by consideration in order to be

12  enforceable." *Jones v. SunTrust Mortg., Inc.*, 274 P.3d 762, 764 (Nev. 2012) (en banc).

13  "Consideration is the exchange of a promise or performance, bargained for by the parties." *Id.*  If

14  a promise is illusory because one side is not obligated to perform, then the contract is

15  unenforceable because there is no mutuality of obligation. *Sala & Ruthe Realty, Inc. v.

16  Campbell*, 515 P.2d 394, 396 (Nev. 1973) (stating that a promise is illusory if there is no

17  obligation to perform and "[m]utuality of obligation requires that unless both parties to a contract

18  are bound, neither is bound").  However, the "implied covenant of good faith and fair dealing

19  [that] exists in every Nevada contract [] essentially forbids arbitrary, unfair acts by one party that

20  disadvantage the other." *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009,

21  1015 (Nev. 2004) (quotation omitted).

22      Some courts have held that if one party to an arbitration agreement has the unilateral

23  right to modify or terminate the agreement, then there is no mutuality because the party with the

1 right to modify or terminate can always decide whether to litigate or arbitrate merely by

2 changing or terminating the agreement.  As a result, that party's promise to arbitrate is illusory.

3 *See In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1065-66

4 (D. Nev. 2012) ("Most federal courts that have considered this issue have held that if a party

5 retains the unilateral, unrestricted right to terminate the arbitration agreement, it is illusory and

6 unenforceable, especially where there is no obligation to receive consent from, or even notify,

7 the other parties to the contract." (gathering cases)).

8       In contrast, Front Gate's promise to arbitrate is not illusory because Front Gate and Live

9 Nation were also bound by the arbitration clause, and any changes to the terms would not apply

10 to a pending claim.  The arbitration clause states that "[a]ny dispute or claim relating in any way

11 to [the user's] use of the Site, or to products or services sold or distributed by [Front Gate] or

12 through [Front Gate], will be resolved by binding arbitration." ECF No 30-3 at 20-21.  This

13 means that Paxson and Live Nation were mutually bound to arbitration.  The modification clause

14 allows Front Gate to

15       make changes to these Terms at any time.  Any changes [Front Gate] make[s] will
      be effective immediately when [Front Gate] post[s] a revised version of these

16       Terms on the Site.  The "Last Updated" date above will tell [the user] when these
      Terms were last revised.  By continuing to use this Site after that date, [the user]

17       agree[s] to the changes.

18 ECF No. 30-3 at 2-3.  Under these terms, changes would take effect only for users of the website

19 after the changes were made.  Changes would not retroactively modify existing claims or allow

20 Front Gate to renege on the promise to arbitrate with users who had accessed the site prior to the

21 changes.  Moreover, Front Gate must exercise its right to modify the arbitration agreement in

22 good faith and not in a way that defeats Paxson's reasonable expectation that the parties are

23 mutually bound to arbitration. *See Reno v. W. Cab Co*., 2020 WL 5606897, at *2 (ruling that

18

under Nevada law, the implied covenant of good faith and fair dealing preserves the validity of

an arbitration agreement with a unilateral modification clause); *see also Cohn v. Ritz Transp.,*

*Inc.*, 2014 WL 1577295, at *2 (concluding that due to the implied good faith covenant, a

"provision that allows employers to unilaterally modify contractual terms, without an actual

demonstration of bad faith, does not render a contract illusory").  Thus, the arbitration agreement

is valid and not illusory.  I therefore grant Live Nation's motion to compel arbitration.

**C.  Front Gate Declarations and Paxson's Motion for Leave to File a Sur-reply**

   **i.   Little Declaration**

Paxson argues that the declaration that Live Nation relies on to support its motion to

compel arbitration is inadmissible for lack of evidentiary support, and that Live Nation's motion

consequently fails.  She contends that Front Gate's Vice President, Brandon Little, did not have

personal knowledge of Front Gate's checkout process when making his declaration, so Live

Nation does not have evidence to support its assertion that Paxson agreed to Front Gate's terms

of use.  She also asserts that Little's declaration presents hearsay issues because Little relied on

"research results" that are not business records.  Live Nation counters that under Ninth Circuit

case law, I may infer the personal knowledge of corporate officers like its declarant by virtue of

their position within the organization.  They also argue that the "research results" are not newly

created records, but preexisting business records of Paxson's purchase that qualify as a hearsay

exception.

When determining whether parties agreed to arbitrate, district courts apply the summary

judgment standard. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021).  Under

Federal Rule of Civil Procedure 56(c)(4), a declaration used to support a summary judgment

motion "must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant or declarant is competent to testify on the matters stated." I

may infer a declarant has personal knowledge from the declaration itself and from the declarant's

position and participation in the matters about "which they swore." *Barthelemy v. Air Lines*

*Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990).

Out-of-court statements offered for the truth of the matter asserted are inadmissible

hearsay unless an exception applies. Fed. R. Evid. 802. If a statement features multiple layers of

hearsay, every layer must qualify for an exception. *United States v. Chivoski*, 742 F. App'x 299,

300 (9th Cir. 2018). As relevant here, Federal Rule of Evidence 803(6) provides a hearsay

exception for

> [a] . . . report, record, or data compilation, in any form, of acts, events, condition,
> opinions, or diagnoses, made at or near the time by, or from information
> transmitted by, a person with knowledge, if kept in the course of a regularly
> conducted business activity, and if it was the regular practice of that business
> activity to make the . . . report, record or data compilation, all as shown by the
> testimony of the custodian or other qualified witness . . . unless the source of
> information or the method or circumstances of preparation indicate lack of
> trustworthiness.

Little's declaration sufficiently demonstrates personal knowledge. It sets out facts

demonstrating his "requisite relationship with a substantial portion of the subject matter of [his]

affidavit" as Front Gate's Vice President of Operational Services. *Case v. Bridgestone/Firestone,*

*Inc.*, No. 93-16771, 51 F.3d 279, 1995 WL 110132, at *2 (9th Cir. 1995). Little avers that he has

worked for Front Gate since 2013, and that his "responsibilities include . . . overseeing and

implementing the Terms of Use that apply to and govern ticket purchases." ECF No. 30-2 at 3.

He attests that he has "investigated and [is] knowledgeable" about Front Gate's online

transaction process, the version of the terms of use in effect on the date that Paxson bought

tickets to Lovers and Friends, and how Paxson assented to the terms to purchase the tickets. *Id.*

1  Thus, I may infer his personal knowledge and rely on his declaration as evidence that Paxson

2  assented to the terms of use.  That Little requested records on Front Gate's checkout process and

3  Paxson's purchase in making his statements does not change his having personal knowledge of

4  them, as the nature of Little's company position and participation in the attested matters

5  (implementing and overseeing Front Gate's online terms of use) reasonably involve reviewing

6  Front Gate's existing records. *See also U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d

7  1040, 1044 (9th Cir. 2009) (ruling that manager was "qualified to testify about the business

8  practices and procedures" of the data in his company's computerized database even though he

9  did not handle each piece of data).

10         The declaration also does not contain inadmissible hearsay because it was based on

11  information that Little learned by personally reviewing Front Gate's regularly kept records on its

12  purchases and checkout processes, which fall under the business records hearsay exception. *See*

13  Fed. R. Evid. 803(6); *see also Derderian v. Sw. & Pac. Specialty Fin., Inc.*, 673 F. App'x 736,

14  738 (9th Cir. 2016) ("[The] declaration was based on information she learned by personally

15  reviewing her employer's business records, and the substance of that declaration could be

16  admitted at trial under the business-records exception to hearsay.").  Little states that by virtue of

17  his position as Front Gate's Vice President of Operational Services, he is familiar with Front

18  Gate's online transaction process. ECF No. 30-2 at 3.  Based on his familiarity, he also states that

19  he reviewed "business records" of Front Gate's transaction process, which came from "historical

20  records for Front Gate's website" and records of Paxson's purchase that were part of Front

21  Gate's "customer records database." ECF No. 30-2 at 3, 5.  From this I can infer that these

22  electronic records of Front Gate's operations were automatically made at or near the time of the

23  recorded event by its online systems, kept in the regular course of Front Gate's business, and

making and keeping these records is part of Front Gate's regular course of business. *See U-Haul Int'l, Inc.*, 576 F.3d at 1043-44. Little thus adequately laid a foundation for the admissibility of the records under Rule 803(6).

Although Paxson takes issue with the fact that Little requested research about Front Gate's checkout process, there is no indication that this was the type of generative report that would not qualify for the business records exception, such as an irregular, special audit ordered to be produced under threat of litigation. *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258 (9th Cir. 1984). Such inadmissible reports are created outside the course of regular business practices, but records of past webpages, including databases of historical webpage code, are not. Just as Front Gate retained a database of customer purchases as part of its regular business activities, it also maintained historical records of its website. ECF No. 30-2 at 5. Thus, the records of Paxson's purchase and Front Gate's checkout page in 2021 are admissible under Rule 803(6).

### ii. Donohue Declaration and Paxson's Motion to File Sur-reply

Paxson requested limited discovery to obtain certified screenshots of Front Gate's checkout page in 2021 that she would have seen when she purchased tickets to Lovers and Friends. I ordered Live Nation to submit historical records of Front Gate's checkout page in August 2021 and any other records of Paxson's checkout process that Little relied on to make his declaration. ECF No. 34. Live Nation subsequently submitted a recreated screenshot of the last step of its checkout process in August 2021, featuring the notice of the terms and the "Purchase Tickets" button. ECF No. 35-2 at 2. Live Nation also attached the code used to recreate the page, along with a declaration from Christopher Donohue, Front Gate's General Manager, explaining that Front Gate does not traditionally keep screenshots of its websites but retains the

1    underlying code. ECF Nos. 35 at 3; 35-1 at 2.  In response, Paxson argued that the recreated

2    screenshots are not historical business records.  She also argued the recreations are unreliable

3    because Live Nation did not submit the full code for the checkout page, and the checkout page

4    image was compressed and lacked a countdown timer.

5          Live Nation replied with an updated, full-page recreation of its checkout page featuring a

6    countdown timer, explaining that Front Gate does not regularly retain screenshots of its

7    webpages and that the webpage code is its historical business record, which it used to recreate

8    Paxson's checkout process in August 2021.  Live Nation also stated that any purported

9    compression is irrelevant because the image still shows the distinct blue/purple color of the

10   underlined hyperlinks contrasting with the darker/black notice text.  Live Nation attached a

11   second declaration from Donohue, who states that Live Nation originally provided the relevant

12   parts of the code and recreated the checkout page (without the countdown timer) only to the

13   extent necessary to display the notice that Paxson would have seen at the time of her purchase.

14   ECF No. 37-1 at 2-3.  He also noted that "[t]he precise color [of the hyperlinked terms] a

15   customer would have encountered from 2020 through 2024 likely varied based on the exact

16   time/day of the transaction," but that the hyperlinks were always a similar shade of blue/purple.

17   *Id.*

18         Paxson now moves for leave to file a sur-reply, arguing that the newly recreated

19   screenshots are new evidence raising new issues.  She seeks to address: (1) that the first recreated

20   screenshots were not completely accurate, contradicting Donohue's statement in his original

21   declaration; (2) that the exact blue/purple shade of the hyperlinks are different between the two

22   recreations; and (3) that the omission of the countdown timer was an improper response to my

23   previous order, raising reliability questions.  In the alternative, she requests that I disregard the

second Donohue declaration and the new recreated screenshots.  Live Nation responds that their reply contained only permissible rebuttable points and did not provide any new evidence or raise new issues because the previous recreation and code were "only [] excerpt[s]" focusing on the notice of the terms, and both the original and new screenshots are identical in showcasing those disputed elements of the checkout process. ECF No. 39 at 2.  They also contend that Paxson has never argued design choices of the checkout page caused her to not notice the terms, and that the absence of the countdown timer is irrelevant.

Generally, sur-replies are "discouraged" under Local Rule 7-2(b) and "[b]road deference is given to a district court's interpretation of its local rules." *Bias v. Moynihan*, 508 F.3d 1212, 1223 (9th Cir. 2007).  But if the non-movant's reply raises new issues or presents new evidence, I may grant the movant an opportunity to respond and address them. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond." (simplified)).  Conversely, if the non-movant's reply does not raise new evidence or issues that require additional argument, I may deny the motion. *See Finley v. Fax*, 683 F. App'x 630, 631 (9th Cir. 2017) ("The district court did not abuse its discretion in denying [the] request for leave to file a sur-reply because the district court reviewed the briefing and found no new issues raised in defendants' reply that necessitated further argument.").

Here, Live Nation did not present new issues or materially new evidence in its reply.  The newly recreated screenshots of the checkout page and images of the code, while admittedly different from the images Live Nation originally submitted with the first Donohue declaration, are not materially new given that both embody the same business record (the webpage code) and

the relevant part of this record submitted in both instances was identical. Live Nation concedes that while the first image of the code was not the complete code, it was the portion that was used to recreate the terms that Paxson would have seen. The updated recreations also do not raise new issues because both versions of the screenshots are consistent in displaying the relevant elements of the checkout process, specifically the notice of terms and the screen flow. Both display a box that the user must affirmatively check to purchase the tickets, with the accompanying notice stating that doing so serves as a signature acknowledging and accepting the terms of sale. ECF Nos. 35-3 at 2; 37-2 at 4. Immediately below is another notice, stating that continuing past the page means agreeing to the terms of use and sale, followed by the "Purchase Tickets" button at the bottom of the page. ECF Nos. 35-2 at 2; 37-2 at 4. The text of the notice is in a black/gray font that is darker than the noticeably lighter blue/purple font of the hyperlinks to the terms of use and sale, as well as the white background. ECF Nos. 35-2 at 2; 37-2 at 4.

Any alleged differences between the two recreations are irrelevant for the purposes of this motion. Live Nation never disputed the existence of a countdown timer on its checkout page, and as I discussed above, a ten-minute checkout time is not a consequential factor when analyzing whether Paxson had reasonably conspicuous notice and assented to the terms of use under Nevada law. Moreover, any alleged discrepancy in the hyperlinks' exact shade of purple/blue is largely indiscernible. Donohue states that the hyperlink font has "consistently been a shade of blue/purple (i.e., HEX#23195A, HEX#330E99)," and these variations are "materially indistinguishable" from each other. ECF No. 37-1 at 3. He also states that the exact shade of blue/purple that customers saw "from 2020 to 2024 likely varied based on the exact time/day of the transaction." *Id.* The standard for reasonably conspicuous notice for online terms under Nevada law does not quibble over minute differences in the shade of the hyperlinks, and

instead focuses on if they are a distinguishably lighter color (i.e., blue) than the surrounding text of the notice (i.e., black) and the background (i.e., white). And in both of Live Nation's recreations, there is a contrast among the lighter blue/purple underlined hyperlinks, the darker surrounding black/gray notice text, and the white background.

Even if I were to grant Paxson's motion, it would be futile because nothing she proposed to address in the sur-reply would materially challenge the evidence or lead me to deny Live Nation's motion to compel arbitration. First, Paxson seeks to address the fact that the first recreated screenshots were not one hundred percent accurate as Donahue originally stated, and that "[h]e doesn't explain how he got the hyperlink colors wrong the first time, or how he has improved his methods." ECF No. 38 at 2. But as I mentioned above, Donahue's second declaration explains the "materially indistinguishable" variations in the exact shade of blue/purple are a function of Front Gate's code. ECF No. 37-1 at 3. I disagree with Paxson's argument that "when viewed in the proper setting, these [hyperlink] colors look nearly the same as the surrounding text." ECF No. 38 at 2. Both sets of the submitted screenshots show lighter, underlined hyperlink colors from Paxson's checkout webpage derived from the historical code. Finally, Paxson's argument that omitting the countdown timer in the original recreation raises credibility questions is also unavailing. Live Nation explained that the timer, like other design components, was first omitted because the parties did not dispute it was part of the checkout process and Paxson had focused on the text colors. And as I already addressed, those facets of the checkout page relating to notice remained materially the same across the two submissions.

At bottom, Paxson does not argue that she was able to purchase the tickets without taking the described actions manifesting assent to the terms, including checking a box and clicking the "Purchase Tickets" button. Nor does she assert that the recreated screenshots show that Front

Gate failed to impose affirmative assent requirements at the time of her purchase.  She does not

argue that Little or Donohue attested to a version of the terms and its accompanying notice that is

significantly different from what she actually encountered during her purchase.  In fact, she

concedes that "[i]n August of 2021, the 'Review & Confirm' checkout page on Front Gate's

website may well have featured the putative assent language." ECF No. 32 at 19.  And she does

not contend that the notice of the terms she encountered was different enough from the recreated

images Live Nation submitted to impact the question of whether she had reasonable notice of the

terms and assented to them.  I therefore deny Paxson's motion for leave to file a sur-reply.

### D. Delegation of Arbitrability Questions to Arbitrator

Live Nation argues that if I find the arbitration agreement valid, I must delegate questions

of arbitrability to the arbitrator per the FAA.  "[I]f a valid agreement exists, and if the agreement

delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019).  Here, the arbitration

agreement states that "[t]he arbitrator, and not any federal, state or local court or agency, shall

have exclusive authority to the extent permitted by law to resolve all disputes arising out of or

relating to the interpretation, applicability, enforceability or formation of this agreement." ECF

No. 30-3 at 21.  Because the arbitration agreement is valid and it encompasses questions of

arbitrability, I delegate any arbitrability issues to the arbitrator.

### E. Dismissal of Claims

Live Nation requests that I dismiss this case because Paxson is required to arbitrate her

claims.  "When a district court finds that a lawsuit involves an arbitrable dispute, and a party

requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."

*Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).  Prior to *Spizzirri*, the Ninth Circuit permitted

district courts the discretion to dismiss actions when the court determined that all the claims were subject to arbitration, even when a party requested a stay. *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1073-74 (9th Cir. 2014).  The Supreme Court in *Spizzirri* did not address whether a district court may dismiss claims subject to arbitration when neither party requests a stay.  While the Ninth Circuit has also not addressed this issue, dismissing the claims when neither party requests a stay does not seem "clearly irreconcilable with the intervening higher authority in *Spizzirri*." *Bazzi v. JPMorgan Chase Bank, N.A.*, No. 24-6, 2024 WL 4690125, at *1 (9th Cir. Nov. 6, 2024).  *Spizzirri* emphasized following the "plain statutory text" of section three of the FAA. *Spizzirri*, 601 U.S. at 476.  Section three states that the court "shall on application of one of the parties stay the trial of the action." 9 U.S.C.A. § 3.  If the "shall" modifies the "stay the trial of the action" as ruled in *Spizzirri*, then "shall" also seems to be modified by "on application of one of the parties" to mean that I am required to stay the action only if a party requests it. *See Spizzirri*, 601 U.S. at 476.  Neither Paxson nor Live Nation requested a stay. Live Nation moved to dismiss the claims.  Therefore, I dismiss Paxson's claims because she must arbitrate them.

### III.    CONCLUSION

I THEREFORE ORDER that the defendants' motion to compel individual arbitration **(ECF No. 30) is GRANTED.**  Plaintiff Erin J. Paxson's claims are dismissed without prejudice to pursue them in arbitration.

I FURTHER ORDER that Paxson's motion for class certification **(ECF No. 11)** is **DENIED as moot**.

I FURTHER ORDER that. Paxson's motion for leave to file a sur-reply **(ECF No. 38) is DENIED.**

I FURTHER ORDER the clerk of court to close this case.

DATED this 21st day of March, 2025.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE